UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

FRANK B. IACOVANGELO, Public Administrator,
Monroe County, as Administrator of the Estate of
Marie Viera,

                                        Plaintiff,

                                                            DECISION AND ORDER

-vs-
                                                            13-CV-6466 CJS

CORRECTIONAL MEDICAL CARE, INC.,
EMRE UMAR, REGISTERED NURSE TAMARA
AUGELLO, REGISTERED NURSE MARYANNE
MCQUEENEY, MARIA BIUSO, COUNTY OF MONROE,
PATRICK M. O'FLYNN, RON HARLING, DEPUTY
DENISE CESARANO, DEPUTY PETER DECOSTE,
DEPUTY CAROLINE MCCLELLAN and
DEPUTY BOBBIE JO BISHOP,

                                        Defendants.

_____


INTRODUCTION

        This is an action under 42 U.S.C. § 1983 brought by the administrator of the estate

of Maria Viera ("Viera"), who died while she was a pretrial detainee at the Monroe County

Jail in Rochester, New York.  Defendant Correctional Medical Care, Inc. ("CMC") had a

contract with Monroe County to provide medial services at the jail.  Generally, Plaintiff

maintains that Viera was a drug-addicted inmate who obviously needed detoxication

treatment, but was deliberately denied such treatment, and who died as a result.  Now

before the Court is Defendants' motion (Docket No. [#16]) to dismiss the Amended

Complaint, and Plaintiff's cross-motion [#26] for an enlargement of time in which to serve

three of the defendants, *nunc pro tunc*.  Plaintiff's cross-motion is granted, but Defendants'

application is also granted and this action is dismissed with prejudice.

1

BACKGROUND

Unless otherwise noted, the following facts are taken from the Amended Complaint in this action, including the attached exhibits.[1]  The Court will briefly set forth the pertinent facts from the Amended Complaint, excluding the conclusory statements and legal conclusions of counsel.[2]

<u>Tuesday, August 31, 2010</u>

On August 31, 2010, at 5:28 p.m., Viera, age 53,  was received at the Monroe County Jail, in connection with pending criminal charges.  In the reception area of the jail, Viera told Deputy R.S., who is not a party, that she was "under the influence of drugs."  Based upon what Viera said, R.S. completed a medical screening form, indicating that Viera had a history of drug and alcohol abuse and that she appeared to be under the influence of drugs.  However, R.S. did not personally observe Viera exhibiting signs of intoxication or withdrawal, but rather, R.S. filled out the form based on what Viera told her.[3]

Approximately three hours later, Tamara Augello, R.N. ("Augello"), who was employed by defendant CMC, examined Viera and performed a medical screening.  At that

---

[1]It is of course well-settled that in resolving a 12(b)(6) motion, the Court is limited as to what it can consider. *See, Vasquez v. City of New York*, No. 10 Civ. 6277(LBS), 2012 WL 4377774 at *1 (S.D.N.Y. Sep.24, 2012). (On a 12(b)(6) motion, "a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.' " *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) (*quoting Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993)).").

[2]The following are just some examples of the many conclusory statements in the pleading that are not supported by factual allegations and which are therefore not accepted as true: "Nurse Augello did a medical screening that was woefully insufficient and deliberately indifferent to Maria Viera's well-being." Amended Complaint ¶ 21; "[I]t was evident to anyone . . . that Ms. Viera needed medically supervised drug and alcohol detoxification." *id*. at ¶ 22;  "Maria Viera would be alive had she received adequate health care in the face of her serious medical needs during her three day stay at the Monroe County Jail." *id*. at ¶ 35; "The above-named Individual Defendants' actions were motivated by bad faith and malice." *id*.at ¶ 43.

[3]Amended Complaint, Exhibit 1 at p. 3, ¶ ¶ 5-6.

time Augello had the paperwork that was completed by R.S., and was therefore aware that R.S. had reported that Viera was under the influence of drugs. Augello was supposed to place Viera's name on a "detox flow sheet" so that she could be monitored, but failed to do so. Augello also failed to perform a check concerning any prescription medications that Viera might have needed, though there are no non-conclusory factual allegations that Viera actually needed prescription medication.[4]   When Viera returned to the reception area of the jail, Deputy R.S. did not place her on "detoxification status," due to the fact that Augello had not completed a "detox flow sheet."   Nevertheless, the remainder of Viera's first night at the jail was apparently uneventful.

   Wednesday, September 1, 2010

   The following morning, at approximately 8:30 a.m., Viera was supposed to attend court for arraignment. However, Viera refused to attend court. In that regard, Viera did not refuse to attend because she was medically unable to do so, but rather, she indicated that she did not want to bother going to court, since she assumed that the arraignment judge would remand her to custody in any event. The judge arraigned Viera in her absence, remanded her to custody, and scheduled another appearance for the following day.

   Ordinarily, following a detainee's arraignment, defendant Deputy Denise Cesarano ("Cesarano"), who worked in the jail's reception area, would receive "post-arraignment paperwork" that would include an indication as to whether the inmate needed further screening by medical staff. However, because Viera did not attend her court appearance, the court did not return Viera's paperwork to Cesarano, but instead, sent the paperwork to the jail's records staff. For this reason, apparently, Viera was not scheduled for a follow-up

---

[4]Amended Complaint at ¶ 23 & Ex. 1 at pp. 3-5, ¶ ¶ 7-8.

3

screening by medical staff.

At around this same time on the morning of September 1st, Cesarano had Viera change into jail-issued clothing, and she noticed that Viera's hygiene was poor. Viera also told Cesarano that she had been using heroin on a daily basis, and had spent the days prior to her arrest in a crack house. Consequently, at approximately 11:19 a.m., Cesarano changed Viera's status on the computer to "detoxification status," based on Viera's statements and on the fact that she was aware of Viera's history of drug usage from past encounters with Viera at the jail. However, several hours later, at approximately 2:45 p.m., Cesarano removed Viera from the detoxification status list because she had not received any paperwork from the jail's medical department.[5]

Later that day, at approximately 5:30 p.m. Deputy R.S. observed that Viera ate her dinner. At around 6:45 p.m., another inmate requested to see a nurse, and R.S. summoned a nurse, defendant Maryanne McQueeney, R.N. ("McQueeney"), to the reception area, where Viera was also housed. As R.S. and McQueeney were walking to see the other inmate, they passed Viera's cell, and R.S. noticed that Viera was "bending over the toilet," apparently due to nausea. R.S. asked Viera "if she wasl alright and [Viera] nodded in response."[6] Despite Viera's affirmative response, R.S. later indicated that she believed that Viera had been "exhibiting clinical signs warranting a nursing assessment," although it is not alleged what those signs were, or if they merely consisted of her "bending over the toilet." Apparently, however, R.S. did not tell McQueeney that she thought McQueeney ought to examine Viera. In any event, Viera did not ask for assistance, and

---

[5]Amended Complaint, Ex. 1 at pp. 5-6, ¶ ¶ 11-12.

[6]Amended Complaint, Ex. 1 at p. 6, ¶ 13.

McQueeney did not examine her.[7]

Later that evening at approximately 10:00 p.m., defendant Deputy Peter DeCoste ("DeCoste") placed Viera back on a computerized list of inmates needing detoxification, although there is no allegation of fact as to why he did so.[8]  The pleading suggests that nothing happened as a result of DeCoste placing Viera back on the detoxification list, since the jail's medical staff did not have access to the reception unit's computers at that time, and no one from the medical staff requested a printout of the detoxification list.

Thursday, September 2, 2010

At approximately 12:40 a.m., defendant Deputy Caroline McClellan ("McClellan") opened the door to Viera's cell to place another inmate into the cell.  As McClellan did so, deputy C.S.[9] observed that Viera was awake and looked at the door, but did not say anything.  McClellan observed that Viera did not appear to be in distress.  Deputy Bobbie Jo Bishop ("Bishop"), who was escorting the other inmate being placed into Viera's cell, also observed that Viera, who was lying on her left side facing the wall, turned her head as the other inmate was being placed into the cell.  Neither McClellan nor Bishop entered the cell at that time.

At approximately 2:10 a.m., Sergeant M.L., who is not a party, made rounds and reported observing nothing unusual.[10]

---

[7]Amended Complaint, Ex. 1 at p. 6, ¶ 13.

[8]Amended Complaint, Ex. 1 at p. 6,  ¶ 14.

[9]The fatality report refers to McClellan as "Deputy C.M.".  The report, immediately after stating that C.M. opened the cell door, indicates that "Deputy C.S." saw that Viera was awake.  There is no other reference to a Deputy C.S., and the Court assumes that this may be a typo, and was intended to mean Deputy C.M..

[10]Amended Complaint, Ex. 1 at pp. 6-7, ¶ 15.

Throughout the night, McClellan and Bishop also conducted rounds every fifteen minutes.  During those rounds, McClellan and Bishop observed that Viera continued to lie on her left side facing the wall, apparently asleep.[11]

At approximately 5:15 a.m., nurse R.W. came to the reception area for "detoxification rounds."  At that time, apparently, R.W. entered Viera's cell and found that she was unresponsive.  Bishop sounded a medical emergency while another deputy initiated CPR.  Additionally, at 5:39 a.m., members of the Rochester City Fire Department arrived at the scene.  However, it was determined that Viera had died during the night and had been dead for an unspecified "extended period."  An investigation by the New York State Commission of Correction concluded that Viera died of Myocarditis, which is an "inflammation of the myocardium," which is the "the middle muscular layer of the heart wall." *Merriam Webster's Medical Dictionary* (1993).[12]

On August 29, 2013, Plaintiff was appointed as administrator of Viera's estate by the Monroe County Surrogate's Court.  On September 2, 2013, Plaintiff commenced this action on the last day of the three-year statute of limitations for actions under 42 U.S.C. § 1983.[13]

On December 31, 2013, Plaintiff filed the Amended Complaint [#9], which alleges that Defendants violated Viera's federal constitutional rights by acting with deliberate

---

[11]Amended Complaint, Ex. 1 at p. 7, ¶ 16.

[12]  According to the website of the Mayo Clinic, "Myocarditis is usually caused by a viral infection." http://www.mayoclinic.org/diseases-conditions/myocarditis/basics/definition/con-20027303 The same website indicates that myocarditis has a variety of causes, including a toxic reaction to the use of illegal drugs such as cocaine.

[13]Defendants indicate that Viera died on September 1, 2010 (Sanders Decl. [#16-1] at ¶ 4, Def. Memo of Law [#16-2] at p. 23), but the fatality report indicates that she died on September 2, 2010, between 12:40 a.m. and 5:15 a.m..

indifference to her serious medical needs.  The pleading maintains that all of the individual

defendants are liable in their individual capacities, and that Monroe County and CMC are

subject to *Monell* liability.  The Amended Complaint demands compensatory and punitive

damages.

To briefly summarize, the Amended Complaint sets forth the facts described above,

as taken from the Commission of Correction's fatality report, but then alleges that

Defendants' actions were motivated by "bad faith and malice."[14]  Essentially, the pleading

maintains that Viera was so obviously in need of detoxification monitoring[15] that

Defendants' failure to provide it must have been due to deliberate indifference to her

serious medical needs.[16]  The pleading further contends, "upon information and belief,"[17]

that Defendants intentionally acted pursuant to a policy of providing sub-standard medical

care to jail inmates, in order to save money.

After commencing the action, Plaintiff served all of the defendants except Augello,

McQueeney and Maria Biuso ("Biuso"), CMC's supervisor at the Monroe County Jail.

Eventually, on April 2, 2014, Plaintiff served Augello and McQueeney, and on April 11,

2014, Plaintiff served Biuso.  In that regard, Plaintiff served Augello and McQueeney 212

days after commencing this action, and served Biuso 221 days after commencing the

---

[14]Amended Complaint ¶ 43.

[15]The pleading also contends, in conclusory fashion, that Viera needed "prescription medication," which Defendants failed to provide. Amended Complaint ¶ 23.  However, the pleading fails to state what type of medical condition that Viera had which required medication, or what type of prescription medication that she needed.

[16]*See, e.g.*, Amended Complaint at ¶ ¶ 21-22 ("Nurse Augello did a medical screening that was woefully insufficient and deliberately indifferent to Maria Viera's well-being.  When Ms. Viera presented herself to Nurse Augello, it was evident to anyone, including other Corrections Officers at the Monroe County Jail, that Ms. Viera needed medically supervised drug and alcohol detoxification.").

[17]Amended Complaint ¶ ¶ 44-46.

action.

On April 17, 2014, Defendants filed the subject motion to dismiss [#16] pursuant to FRCP 12(b)(6) and FRCP 4(m). The Rule 4(m) motion is brought on behalf of Augello, McQueeney and Biuso, and maintains that the action must be dismissed against them because Plaintiff failed to serve them within 120 days after the complaint was filed, without good reason. With regard to the 12(b)(6) motion, Defendants assert the following points about the Amended Complaint: 1) it fails to allege activity rising to the level of deliberate indifference, and pleads negligence at most; 2) it fails to plead that Sheriff Patrick O'Flynn ("O'Flynn"), Jail Superintendent Ron Harling ("Harling"), CMC's President Emre Umar ("Umar") or Biuso were personally involved in the alleged constitutional violation; and 3) it fails to plead municipal liability against Monroe County or CMC.

On May 27, 2014, Plaintiff filed a response [#25][18] to Defendants' motion, along with a cross-motion [#26] for leave to serve Augello, McQueeney and Biuso beyond the 120 limit allowed in Rule 4(m). With regard to the deliberate indifference claim, Plaintiff maintains that "drug and opiate withdrawal" is an objectively serious medical condition, and that Defendants acted with the requisite subjective intent, that was "the equivalent of criminal recklessness."[19] In that regard, Plaintiff contends that the instant case is similar to what happened in *Livermore v. City of New York*, No. 08 CV 4442 (NRB), 2011 WL 182052 (S.D.N.Y. Jan. 13, 2011), which the Court will discuss below. With regard to the

---

[18]The response repeats many of the same conclusory unsupported claims that appear in the Amended Complaint, and goes further to allege that Viera "suffered in agony for days and ultimately succumbed to an entirely preventable death." Pl. Memo of Law [#25] at p. 4. However, the Amended Complaint does not plausibly plead a causal connection between the alleged failure to provide "detoxification monitoring" and Viera's death from Myocardia, and further, Viera never indicated that she was in pain, let alone agony, or requested any type of medical attention as far as Plaintiff knows.

[19]Pl. Memo of Law [#25] at p. 8.

Rule 4(m) application, Plaintiff contends that the Court should extend the time for service, *nunc pro tunc*, since he made a good faith effort to serve Augello, Biuso and McQueeney.

On June 17, 2014, Defendants filed papers further supporting their motion to dismiss and opposing Plaintiff's cross-motion.   The Court has determined that oral argument is not necessary.

## DISCUSSION

### Defendants' Motion to Dismiss Pursuant to FRCP 4(m)

Augello, Biuso and McQueeney maintain that they are entitled to dismissal under Rule 4(m), and the law in that regard is clear:

Pursuant to Rule 4(m):

> If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m). A district court also has discretion to enlarge the 120–day period for service in the absence of good cause.

*Green v. Unwin*, 563 Fed.Appx. 7 (2d Cir. Apr. 15, 2014) (citation omitted).   In this case, Plaintiff maintains that there is good cause to extend the time for service because he diligently attempted to discover the identities and addresses of these three defendants, who no longer are employed by CMC, and because, according to his process server, these defendants attempted to evade service, which required him to resort to "nail and mail" service.   There does not appear to be any prejudice to Defendants, and there is a strong policy in this Circuit of resolving disputes on their merits.   The Court will, therefore,

exercise its discretion and extend the time for service on Augello, Biuso and McQueeney, *nunc pro tunc*. Accordingly, Plaintiff's cross motion for an enlargement of time [#26] is granted.

<u>Defendants' Motion to Dismiss Pursuant to FRCP 12(b)(6)</u>

Before addressing the merits of the 12(b)(6) application, the Court makes several general observations about the Amended Complaint. First, as Defendants point out, this case is unusual in that Plaintiff has no personal knowledge about the key matters that are alleged in the Amended Complaint. In that regard, Plaintiff is acting in the capacity of Public Administrator for Monroe County, and as the Administrator of Viera's estate. Of course, Ms. Viera, who experienced the events at issue here, is deceased, and she apparently left no record of her experiences. Consequently, as the Amended Complaint reveals, the factual basis for the constitutional claim comes from two sources: 1) a "fatality report" by the New York State Commission of Correction that details the thirty-six hours, approximately,[20] that Viera spent at the jail prior to her death;[21] and 2) a newspaper article that is critical of defendant CMC and other for-profit corporations that provide contract health services to jails.[22]

The fatality report indicates that Viera died of Myocarditis, and that jail staff made errors concerning placing her on "detoxification status." However, the report does not

---

[20]The Amended Complaint indicates that Viera spent "three days" at the jail, but that is clearly incorrect. (Amended Complaint ¶ ¶ 35; see also, ¶ 45 ("several days")). Viera was received at the jail on August 31, 2010 at approximately 5:28 p.m., and her death was discovered on September 2, 2010 at approximately 5:15 a.m., at which time she had been dead for several hours. Accordingly, she spent less than 36 hours alive at the jail.

[21]Amended Complaint, Exhibit A.

[22]Amended Complaint , Exhibit C. The newspaper article questions the legality of such corporations and maintains that several inmates have died at various prisons and jails where such corporations have contracted to provide medical services.

indicate that such errors were the cause of Viera's death.[23]   The report also does not indicate what treatment, if any, Viera would have received if she had remained on detoxification status,  nor does it indicate that such treatment would have prevented Viera's death.[24]   Furthermore, there is nothing in the report to suggest that any defendant knew that Viera had Myocarditis, or that she had any other illness, for that matter.  At most, the report indicates that some defendants either observed that Viera was under the influence of drugs/alcohol, or knew that she had a history of using drugs and needed detoxification. As far as exhibiting symptoms, the pleading indicates, at most, that on a single occasion a staff member saw Viera bending over a toilet, immediately after which Viera indicated that she was alright.  Consequently, the pleading's assertion that Viera "suffered in agony for days" has no factual support.[25]

The Amended Complaint nevertheless strongly insinuates that Viera died due to a lack of "medically supervised withdrawal."[26]  However, Plaintiff's contentions in that regard are unsupported.  For example, apart from a conclusory assertion, the Amended Complaint does not plead facts to plausibly support the contention that death from Myocarditis is a

---

[23]Amended Complaint, Ex. C at p. 2.

[24]The pleading itself similarly fails to explain the detoxification procedures that were allegedly not followed.  At most, the pleading indicates that Viera's name was not placed on the detoxification monitoring list, but does not explain how she would have been treated differently if her name had remained on the list.

[25]Pl. Memo of Law [#25] at p. 4.

[26]Amended Complaint ¶ ¶ 25, 29.  As best as the Court can determine from the pleading, Plaintiff maintains that Viera should have received "medically monitored alcohol and drug withdrawal," though the exact nature of such monitoring is not explained.

potential, let alone foreseeable, outcome of failing to provide detoxification monitoring.[27]

In any event, the Amended Complaint purports to seek recovery only "for the deprivation of rights secured to Viera *before her death*."[28]

Furthermore, the fatality report was written with the benefit of hindsight, by someone who had all the facts following an investigation. However, none of the individual defendants had all of those facts. Instead, as the report indicates, the various jail employees encountered Plaintiff during their individual shifts, at various points over the course of a day and a half, and some of those employees knew nothing about Viera's past drug usage or the fact that she claimed to be intoxicated upon entering the jail.[29] Moreover, as already mentioned there is no indication that any defendant, or even Viera herself, knew that she had Myocardia.

Additionally, although the pleading contends, in conclusory fashion, that Defendants "*ignore[d]* Maria Viera's serious medical problems and *refused* to provide her with appropriate, necessary medical treatment,"[30] the fatality report belies that assertion. Rather, the fatality report indicates that several defendants acted on their own initiative and placed Viera's name on a list for detoxification monitoring, but those notes never made it to the medical staff during Viera's brief stay at the jail. At most, the pleading indicates that

---

[27]The pleading states in conclusory fashion that it is "well known that when detainees are denied appropriate medically supervised withdrawal from drug and alcohol addiction , this can result in a number of serious health effects, including death," obviously referring to death from Myocarditis since that was Viera's cause of death. Amended Complaint ¶ 25, 29 & Exhibit A at p. 2. However, the Court ran a Westlaw search of the ALLFEDS, NY-CS-ALL and TP-ALL databases using the terms "myocarditis," "withdrawal" and "detoxification" and found no case, book or article linking the development of myocarditis, or death from myocarditis, to withdrawal from heroin, cocaine or alcohol.

[28]Amended Complaint ¶ 6 (emphasis added).

[29]At least, there is nothing in the Amended Complaint that plausibly suggests that they knew.

[30]Amended Complaint ¶ 41 (emphasis added).

certain defendants could have done more.

On that same point, the instant case is also unusual in that, unlike most medical deliberate indifference actions involving prisoners, Viera never requested medical assistance.  In fact, when a defendant asked Viera "if she was alright," she indicated that she was.[31]  In that regard, there is no indication that Viera was incompetent or otherwise incapable of expressing her needs.  Consequently, the claim here is not based on Defendants' failure to provide *requested* medical assistance, but rather, it is based on Defendants' alleged failure to follow a policy that purportedly required the monitoring of inmates who were experiencing withdrawal from drugs and/or alcohol, whether they requested it or not.  With those points in mind, the Court will now consider the merits of Defendants' motion to dismiss.

The general legal principles concerning motions under FRCP 12(b)(6) are well settled:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007); *see also, ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.

---

[31]Amended Complaint, Ex. A at ¶ 13.

2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (*quoting Bell Atl. Corp. v. Twombly* ) (footnote omitted).

When applying this "plausibility standard," the Court is guided by "two working principles":

> First, although a court must accept as true all of the allegations contained in a complaint,[32] that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss, and determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations and internal quotation marks omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 1950 (2009) (citation omitted).  "The application of this 'plausibility' standard to particular cases is 'context-specific,' and requires assessing the allegations of the complaint as a whole." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Retirement Plan v. Morgan Stanley Inv. Management Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (citation and internal quotation marks omitted).

"The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading

---

[32]The Court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999), *cert. den.* 531 U.S. 1052, 121 S.Ct. 657 (2000).

facts alleged "upon information and belief" where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citation and internal quotation marks omitted).[33]

Plaintiff maintains that Defendants violated  Marie Viera's federal constitutional rights by acting or failing to act with deliberate indifference to her serious medical needs. The general legal principles governing such claims are well settled:

> A convicted prisoner's claim is analyzed under the Eighth Amendment. *See Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir.1996) (noting that the Eighth Amendment governs medical claims of convicted persons because of that Amendment's prohibition of "cruel and unusual punishment"). In the case of a pre-trial detainee, the same claim is analyzed under the Due Process Clauses of the Fifth Amendment for federal detainees and the Fourteenth Amendment for state detainees. Compare *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir.2009) (applying Fourteenth Amendment to state detainee), with *Cuoco v. Moritsugu*, 222 F.3d 99, 103, 106 (2d Cir.2000) (applying Fifth Amendment to federal detainee). However, Plaintiff's status is of no moment for these purposes, because "[c]laims for deliberate indifference to a serious medical condition ... should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Caiozzo*, 581 F.3d at 72.

---

[33]The Amended Complaint contains eight (8) allegations that are made "upon information and belief. *See*, Amended Complaint ¶ ¶ 15, 16, 17, 18, 30, 44, 45,  & 46.  However, only four of those pertain to Defendants' potential liability.  Those four allegations are as follows: 1) "Upon information and belief , Ms. Viera showed signs of being in distress during the course of that evening [early morning hours of September 2, 2010] when she was guarded by Defendants R.S. and Deputy Bobbie Jo Bishop, who were supposed to make rounds during the evening."; 2) "Upon information and belief, these Defendants [Monroe County, O'Flynn and Harling] had a policy and/or practice of not providing appropriate medical care to detainees at the Monroe County Jail, including providing those detainees with appropriate medically supervised detoxification"; 3) "Upon information and belief, Correctional Medical Care, through either express policy, practices or the inaction of its policy makers, had a policy and/or practice of not providing appropriate medical care to detainees at the Monroe County Jail, including providing those detainees with appropriate medically supervised detoxification"; 4) "Upon information and belief, one reason why Maria Viera failed to receive adequate medical treatment was because of concerns by Correctional Medical Care regarding the expenses involved in properly caring for her and other detainees." Amended Complaint ¶ ¶ 30, 44, 45 & 46.  As discussed further below, none of those statements are supported by factual allegations or reasonable inferences.

While prison officials should provide adequate medical care to prisoners, "not every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir.2006). To make out a constitutional claim "arising out of inadequate medical care," a plaintiff must demonstrate a defendant's " 'deliberate indifference to [his] serious medical needs.' " *Jones v. Vives*, 523 Fed.Appx. 48, 49 (2d Cir.2013) (alteration in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)); *see also Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir.2003). Thus, to avoid dismissal under Rule 12(b)(6), "an inmate must allege that: (1) objectively, the deprivation the inmate suffered was sufficiently serious"; and "(2) subjectively, the defendant official acted with a sufficiently culpable state of mind." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir.2013) (internal quotation marks omitted).

*Bell v. Jendell*, 980 F.Supp.2d 555, 559 (S.D.N.Y. 2013).  Further, in that regard,

"Objectively, the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration or extreme pain[,] exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996) (citation and internal quotation marks omitted). Where the allegation is that the defendant failed to provide any treatment for the medical condition, "courts examine whether the inmate's medical condition is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir.2006). Where the challenge is to the adequacy of the treatment provided, such as in cases where treatment is alleged to have been delayed or interrupted, the seriousness inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." *Smith [v. Carpenter]*, 316 F.3d [178,] 186 [(2d Cir. 2003)].

***

"Subjectively, the official charged ... must act with a sufficiently culpable state of mind." *Curcione*, 657 F.3d at 122 (citation and internal quotation marks omitted); *see also Chance [v. Armstrong]*, 143 F.3d [698,] 703 [(2d Cir. 1998)]. A person acts with deliberate indifference to an inmate's health or safety only if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer [v. Brennan]*, 511 U.S. [825,] 837 [(1994)].

*Hanrahan v. Mennon*, 470 Fed.Appx. 32, 33 (2d Cir. May 18, 2012); *see also, Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir.2003) ("[A] prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability. An official acts with the requisite deliberate indifference when that official *knows of and disregards* an excessive risk to inmate health or safety, a state of mind equivalent to the familiar standard of 'recklessness' as used in criminal law.") (emphasis added; citations and internal quotations omitted); *Youmans v. City of New York*, — F.Supp.2d — , 2014 WL 1612997 at *6 (S.D.N.Y. Mar. 31, 2014) ("In other words, the charged official must act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result.") (emphasis in original; citations and internal quotation marks omitted).

Medical deliberate indifference claims are most-often asserted against medical staff. Nevertheless, non-medical personnel may also be liable for deliberate indifference to medical needs under certain circumstances:

> To establish such a claim plaintiff must prove that prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problems known to the attendant prison personnel or that the inmate suffered a complete denial of medical treatment. At a minimum, there must be at least some allegations of a conscious or callous indifference to a prisoner's rights.

*Hodge v. Coughlin*, No. 92 Civ. 0622 (LAP), 1994 WL 519902 at *11 (S.D.N.Y. Sep. 22, 1994) (citations and internal quotation marks omitted), *affirmed*, 52 F.3d 310 (2d Cir. Mar. 9, 1995) (table); *see also*, *Jean v. Barber*, No. 9:09–cv–430 (MAD/GHL), 2011 WL 2975218 at *5 (N.D.N.Y. Jul. 21, 2011)("Non-medical personnel may engage in deliberate indifference if they intentionally deny or delay access to medical care.") (citations omitted).

With these general legal principles in mind, the Court will proceed to consider whether the Amended Complaint states plausible claims of deliberate indifference to a serious medical need.

### I. The Amended Complaint fails to state an objectively serious medical condition

At the outset, to the extent that the pleading attempts to rely on Myocarditis as the objectively serious medical condition, the Court finds that such condition could satisfy the objective prong of the analysis.  However, that is of no benefit to Plaintiff since there is no indication that any defendant knew that Viera had Myocarditis or any similar condition.

Plaintiff further maintains that Viera's need for medical detoxification was an objectively serious condition, since "symptoms associated with alcohol and opiate withdrawal represent a serious medical condition."[34]  For support, Plaintiff cites *Livermore v. City of New York*, 2011 WL 182052 (S.D.N.Y. 2011), *Mayo v. County of Albany*, No. 09-1745-cv357, Fed.Appx. 339, 341-342 (2d Cir. Dec. 17, 2009) ("*Mayo*") and *Caiozzo v. Koreman*, 581  F.3d 63, 72 (2d Cir. 2009).  However, the Court does not agree that those cases reflect a *per se* rule that drug/alcohol withdrawal is an objectively serious medical condition.

In *Mayo*, the Circuit Court remarked that, "[*t]o the extent that* withdrawal from heroin and alcohol addictions presents a serious medical condition, *it appears undisputed* that Mayo satisfied the first prong of the test." *Mayo*, 357 Fed.Appx. at 341 (emphasis added). In that regard, the inmate in *Mayo* was a heroin addict who had informed the jail medical staff "that she had experienced withdrawal problems on prior attempts to quit drugs," and

---

[34]Pl. Memo of Law [#25] at p. 7.

had taken an opioid drug to help with withdrawal.[35]   The jail staff further observed the inmate exhibit "tremors, agitation and visual hallucinations [such as seeing insects,]" but failed to closely monitor her, as a result of which she attempted suicide by hanging and suffered permanent brain damage.[36]   As mentioned above, the parties in *Mayo* did not dispute that such symptoms qualified as an objectively serious medical condition, and the Second Circuit therefore had no reason to analyze the issue.   Consequently, *Mayo* involved different facts than those presented here, and the statement by the Second Circuit upon which Plaintiff relies does not establish that withdrawal symptoms are necessarily objectively serious in all cases.

The *Caizzo* decision involved a male inmate who was known to the jail medical staff to be chronic alcoholic, due to the fact that he had been incarcerated "on at least twenty-seven separate occasions, and had been treated for chronic alcoholism by the facility's medical staff." *Caiozzo*, 581 F.3d at 66.   Upon entering the jail, the inmate appeared to be intoxicated, smelled of alcohol and "exhibited abnormal behavior." *Id*.   The inmate told the intake nurse that he consumed alcohol every day, and that he was "possessed." *Id*. at 66-67.   The inmate also apparently told the intake nurse that he had recently been hospitalized for psychiatric treatment. *Id*. at 67.   However, the intake nurse did not immediately begin detoxification treatment, because she mistakenly understood that the inmate had recently consumed alcohol, when he actually had not consumed alcohol for a day, and was already beginning to experience withdrawal.   Later, the inmate began "yelling

---

[35] *See, Mayo v. County of Albany*, No. 07–cv–823 (GLS–DRH), 2009 WL 935804 at *1 (N.D.N.Y. Apr. 3, 2009).

[36] *Id*. at *1-2.

19

an acting irrationally," vomited once, and stated that he was experiencing withdrawal. *Id*. Still later, the inmate had "some sort of spasm" and fell out of his bunk. *Id*. at 67-68.  The inmate died a short time later, and his death was attributed to "seizure due to acute and chronic alcoholism." *Id*. at 68.   On appeal from the district court's grant of summary judgment, the Second Circuit merely observed that, "[*h*]*ere*, this is *no dispute* that Caiozzo had a serious medical condition." *Id*. at 72 (emphasis added).   Consequently, *Caiozzo*, which involved much different facts, also fails to support Plaintiff's contention that drug/alcohol withdrawal always qualifies as an objectively serious medical condition.

The correct statement of the law is that whether an inmate's withdrawal/detoxification amounts to an objectively serious medical condition depends upon the particular symptoms that the inmate is exhibiting. *See, e.g., Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) ("Because the objective component of an Eighth Amendment claim is  necessarily contextual and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case.") (citation and internal quotation marks omitted).  In that regard, mild withdrawal symptoms, such as vomiting, do not necessarily qualify as an objectively serious medical condition. *See, Avallone v. Hofman*, Nos. 2:06–CV–253, 2:07–CV–1, 2009 WL 2957955 at *5 (D.Vt. Sep. 9, 2009) ("Avallone's withdrawal symptoms included a seizure, vomiting, diarrhea, and dehydration for a period of two days. These sorts of symptoms do not generally provide the basis for an Eighth Amendment claim."); *see also, Feder v. Sposato*, No. 11–CV–193 (JFB)(WDW), 2014 WL 1801137 at *8 (E.D.N.Y. May 7, 2014) ("Considering the facts in the light most favorable to plaintiff, the Court cannot determine as a matter of law whether plaintiff's condition—physical pain and morphine withdrawal—constituted a serious medical need.

20

Armor's Withdrawal Assessment, signed by Rhim, shows that plaintiff experienced only "mild nausea, no vomiting and/or diarrhea," mild anxiety, and "very mild" headaches during the first six days following his transfer to the NCCC.").

In the instant case, the only factual allegation concerning Viera's withdrawal symptoms is that she was observed, on one occasion, bending over a toilet, presumably to vomit.  There is no suggestion that Viera exhibited other signs of withdrawal, or that she requested assistance due to withdrawal.  Consequently, the Amended Complaint fails to plausibly allege that Viera's withdrawal symptoms were "objectively serious."

Nevertheless, the Court will proceed to consider whether any defendant was deliberately indifferent to Viera's condition, assuming *arguendo* that her withdrawal symptoms were objectively serious.

## II. The Amended Complaint Fails to Plausibly Allege Subjective Deliberate Indifference by Any Defendant

<u>Medical Jail Staff:  Nurse Augello and Nurse McQueeney</u>

<u>*Nurse Augello*</u>

The Amended Complaint plausibly alleges that Augello failed to place Viera on the detoxification flow sheet, to be monitored.  Apparently, the Commission of Correction determined that in doing so, Augello failed to follow CMC's "Procedure # 153," though it is unclear to the Court why that would be.  In that regard, the fatality report suggests that Procedure #153 applies where an inmate "admit[s] to daily [alcohol] or drug consumption."[37]  However, according to the report, the only information that Augello had

---

[37]Amended Complaint, Ex. 1 at p. 4.  There appears to be a typo in the report, omitting the word "alcohol."

about Viera  was 1) Deputy R.S.'s screening form; and 2) her own observations.  As to R.S.'s screening form, it merely indicated that Viera was "under the influence of alcohol or drugs," and that she had "a history of drug or alcohol abuse," but did not indicate that Viera used alcohol or drugs "*daily*" as required for Procedure # 153 to apply.[38]  Nor is there any indication that Viera told Augello that she used drugs on a daily basis.  Consequently, the pleading does not plausibly indicate that Augello knew the extent of Viera's drug use.  Significantly, in that regard, Augello did not know what Cesarano learned the following day, which was that Viera had been using heroin and crack on a daily basis prior to her arrest.

As to Augello's own observations, there is nothing to indicate that Viera was exhibiting signs of intoxication or withdrawal at that time.   In that regard, R.S., who examined Viera shortly before Augello,  indicated that she only completed the alcohol/drug screening form because Viera *told* her that she was under the influence of drugs; the fatality report specifically indicates that R.S. did not personally observe Viera exhibiting the symptoms of intoxication or withdrawal.[39]

In any event, as Plaintiff admits,[40] the Commission of Correction determined that Nurse Augello's failure to place Viera on detoxification monitoring was due to her inexperience, not to any intentional wrongdoing.  Plaintiff contends, however, that Auguello should have recognized her own inexperience, and sought assistance from "a supervisor

---

[38]Amended Complaint, Ex. 1 at p. 3.

[39]Amended Complaint, Ex. 1 at p. 3 ("Deputy R.S. stated that she gave an affirmative answer to the question as Viera *self-reported* [that] she was under the influence of drugs.  *Deputy R.S. stated that she did not observe any of the listed symptoms.*") (emphasis added).

[40]Pl. Memo of Law [#25] at p. 11.

or doctor," and that her failure to do so amounts to deliberate indifference.[41]   Plaintiff impliedly concedes the weakness of the claim against Augello, but maintains that he should be permitted to conduct discovery, in light of the "low standard on a motion to dismiss."[42]   However, the Court disagrees with Plaintiff in that regard and finds, as Defendants maintain, that Auguello's failure to place Viera on the detox list, as pleaded, amounts to negligence at most.

The Amended Complaint also alleges, but does not plausibly plead, that Augello "failed to address Ms. Viera's need for prescription medication."[43]   In that regard, the pleading does not indicate that Viera told Augello that she was taking prescription medication, let alone what that medication was or why it had been prescribed to Viera.

### Nurse McQueeney

Plaintiff contends that Nurse McQueeney was deliberately indifferent because she saw Viera vomiting and exhibiting unspecified signs of "distress," but did not do anything.[44] However, to be guilty of a constitutional violation, McQueeney would have needed to be deliberately indifferent to a known serious medical need, which Plaintiff maintains was drug and alcohol withdrawal.  The facts, though, in the Amended Complaint do not support such an inference.  At the outset, McQueeney was called to the reception area of the jail not to examine Viera, but to examine another inmate.  Moreover, there is nothing to suggest that McQueeney knew Viera's history of drug and alcohol usage, or anything else about her.

---

[41]Pl. Memo of Law [#25] at pp. 11-12.

[42]Pl. Memo of Law [#25] at p. 12.

[43]Amended Complaint at ¶ 23.

[44]Pl. Memo of Law [#25] at p. 12.

Consequently, there is no basis to infer that McQueeney even knew that Viera had a serious medical condition.[45]   Further, even assuming that McQueeney saw Viera vomiting,[46] the corrections officer accompanying McQueeney asked Viera if she was ok, and Viera nodded in the affirmative.[47]   Such facts are insufficient to state a deliberate indifference claim against McQueeney. *See, e.g., Avallone v. Hofman*, 2009 WL 2957955 at *5 ("Avallone's withdrawal symptoms included a seizure, vomiting, diarrhea, and dehydration for a period of two days. These sorts of symptoms do not generally provide the basis for an Eighth Amendment claim.").

Non-medical Jail Staff:  Deputy Cesarano, Deputy DeCoste,
Deputy McClellan and Deputy Bishop

The Amended Complaint contends that Deputies Cesarano, DeCoste, McClellan and Bishop were deliberately indifferent to Viera's need for detoxification monitoring. However, the Court finds that these claims are not plausibly pleaded.  With regard to such claims generally, the Amended Complaint indicates that Viera was denied "detoxification

---

[45]The Amended Complaint makes the conclusory assertion, based on an opinion expressed by Deputy R.S., that when McQueeney was in the vicinity, Viera "was showing the signs of detoxification." Amended Complaint ¶ 28.  However, that assertion is unsupported, since the fatality report indicates only that Viera "was observed to be exhibiting clinical signs warranting a nursing assessment of Viera." *See*, Amended Complaint, Ex. 1 at p. 6, ¶ 13.  Consequently, the pleading misstates what is contained in the report, because R.S. did not indicate that Viera was exhibiting signs of detoxification.  That is, the fatality report does not say what those "clinical signs" were, nor does it indicate that such "clinical signs" were indicative of drug or alcohol  withdrawal. *Id*. Accordingly, the pleading does not plausibly suggest that McQueeney was deliberately indifferent to Viera's need for detoxification monitoring.  At most, it suggests that McQueeney should have looked into why Viera might be vomiting, but the failure to do so, without more, is not a constitutional violation, especially where Viera indicated that she was ok.

[46]The fatality report does not expressly indicate that McQueeney saw Viera bending over the toilet.  Rather, it states that Deputy R.S. saw Viera bending over the toilet.  Although R.S. was purportedly escorting McQueeney to see another inmate, it is certainly possible that R.S. saw Viera and McQueeney did not.  Moreover, it was R.S. who asked Viera if she was ok, not McQueeney.

[47]Since McQueeney was already in the cell block at the request of another inmate, there is no reason to think that she would not also have checked on Viera if Viera had made such a request.

monitoring," which is apparently a form of medical treatment/monitoring to be provided by medical staff.[48]  In the situation presented here, it would have been reasonable for non-medical personnel to assume that Viera, who had just been admitted to the jail, had been recently and properly evaluated by medical staff concerning  the need for detoxification monitoring.  Moreover, since the jail's medical staff had not placed Viera on detoxification status, it would have been reasonable for the non-medical jail employees to assume that the medical staff had determined that she did not need detoxification monitoring. Consequently, even assuming that such non-medical staff believed that Viera needed detoxification, it does not appear that they had the power or duty to intervene in her health care, particularly where she never requested such assistance.[49] *See, Rivera v. Pataki*, No. 04 Civ. 1286(MBM), 2005 WL 407710 at *29 (S.D.N.Y. Feb. 7, 2005) ("[T]he Circuit has held that a non-medical defendant should not intercede in the medical treatment of an inmate.") (*citing Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000)); *Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000) ("Cuoco was under medical treatment. Cuoco suggests no basis on which to conclude that Moore or Hershberger should have challenged the responsible doctors' diagnosis. One can imagine the repercussions if non-medical prison officials were to attempt to dictate the specific medical treatment to be given to particular prisoners—for whatever reason.").  Consequently, while the pleading seemingly contends that the non-medical jail employees had a duty to contact the medical staff and request

---

[48]The fatality report indicates that nurses came into the cell block area to perform "detoxification rounds." Amended Complaint, Exhibit A, ¶ 17.

[49]This notion is supported by the fact that Cesarano removed Viera's name from the detoxification list when paperwork supporting such treatment was not received from the medical department.  The Court is not suggesting that corrections officers should not notify medical staff when they believe that an inmate needs assistance.  Instead, the Court is indicating that here, the corrections officers had reason to know that Viera had just been evaluated by the medical staff.

detoxification monitoring, *i.e.*, medical assistance, for Viera, their failure to do so under the facts presented here does not amount to a constitutional violation.

With those general observations in mind, the Court will discuss each of the non-medical jail employees in more detail below.

<u>Deputy Cesarano</u>

The pleading maintains that Cesarano was deliberately indifferent to Viera's serious medical need because she "removed Viera from the 'detox' list without making any inquiry of supervisory or medical personnel."[50] However, the only non-conclusory factual support on that point is from the fatality report, which indicates that Cesarano "removed Viera from detoxification on the status board in the computer *since no formal paper work was provided by the facility's medical department*."[51]   The reasonable inference, therefore, is that Cesarano needed such paper work from the medical department in order to maintain Viera on the detoxification list, and that she only removed Viera's name from the list because she did not receive such paperwork.

There is simply no indication that  Cesarano was acting recklessly with regard to Viera's health.  To the contrary, the report emphasizes that Cesarano took it upon herself in the first instance to place Viera's name on the detoxification list, pending further paperwork from the medical department, because she was aware of Viera's history of drug use, and because Viera had told her that she had been using drugs at the time of her arrest.  Nor is there any indication, in either the fatality report or the pleading, that Cesarano observed Viera actually exhibiting symptoms of withdrawal/detoxification.

---

[50]Amended Complaint ¶ 26.

[51]Amended Complaint, Ex. 1 at p. 6 (emphasis added).

Accordingly, the Court finds that the pleading fails to state a deliberate indifference claim against Cesarano.

*Deputy DeCoste*

According to the fatality report, DeCoste's only involvement in this action came on the evening of September 1, 2010, when he placed Viera's name back on the computerized detoxification list, presumably so that she could receive detoxification monitoring.[52]  Notably in that regard, there is no specific indication as to why DeCoste did so.  That is, there is no non-conclusory factual allegation as to what DeCoste might have observed that would have caused him to place Viera's name on the detoxification list.[53]  Nor is there any suggestion that DeCoste was personally aware of the extent of Viera's history of drug usage.

As with Cesarano, any suggestion that DeCoste harbored malice toward Viera, or acted recklessly toward her, is belied by the fact that he took it upon himself to place her name *onto* the detoxification list.  Nevertheless, Plaintiff maintains that DeCoste was deliberately indifferent to Viera's medical needs, because he "did not inform medical staff [that he had placed Viera on the detoxification list], or otherwise contact medical staff seeking assistance for Viera."[54]  However, for the reasons already discussed concerning non-medical staff, the Court disagrees and finds that the pleading fails to state a plausible

---

[52] The fatality report indicates that at the relevant time, the jail's procedure was for the medical department to request a copy of the deputies' detoxification list. Amended Complaint, Ex. 1 at p. 6, ¶ 14.  However, no one from the medical department requested a copy of the detoxification list during the brief span between the time DeCoste placed Viera's name on the list and the time that she died.

[53] At most, the reasonable inference is that DeCoste might have seen Viera vomit, since R.S. claimed that, later that evening, he saw Viera bending over the toilet.

[54] Amended Complaint ¶ 27.

deliberate indifference claim against DeCoste.

<i><u>Deputies McClellan and Bishop</u></i>

The Amended Complaint alleges, "upon information and belief," that Bishop was deliberately indifferent to Viera's medical needs because she ignored Viera's "distress."[55] In that regard, the pleading seems to suggest that Bishop failed to make her rounds as required.[56]   However, those allegations are entirely speculative, and are belied by the fatality report.  For example, there is no indication that Bishop observed Viera exhibiting any signs of distress.  Rather, the fatality report indicates that Bishop observed Viera in her cell, awake and in no apparent distress, at approximately 12:40 a.m., and that during the rest of the night Viera appeared to be sleeping.  Consequently, the Amended Complaint does not state an actionable deliberate indifference claim against Bishop.

As for McClellan, the pleading lists her name in the caption, indicates that she was a deputy employed by the Monroe County Sheriff, and states that she was "stationed in the Jail Booking Room in the early morning hours of September 2, 2010."[57]   Otherwise, though, the Amended Complaint does not mention McClellan.  Even assuming, *arguendo*, that McClellan is the same "Deputy C.M." that is mentioned in the fatality report, then she would be entitled to dismissal for the same reasons as Bishop.  Namely, the fatality report indicates that Deputy C.M. observed Viera alive and in no apparent distress at approximately 12:40 a.m., and that she thereafter made rounds every fifteen minutes

---

[55]Amended Complaint ¶ 30.

[56]Amended Complaint ¶ 30 (Indicating that Viera "was guarded by" Bishop, who was "supposed to make rounds during the evening.").

[57]Amended Complaint ¶ 17 (misspelling McClellan's name as "Deputy McClennan").

throughout the night, during which Viera appeared to be asleep.[58]   Consequently, the Amended Complaint fails to state an actionable claim against McClellan.

### The County of Monroe, Sheriff O'Flynn and Superintendent Harling

The Amended Complaint contends that Monroe County, O'Flynn and Harling are liable under § 1983 because O'Flynn and Harling were county policymakers who enforced a policy of not providing medical care to jail detainees.[59]   However, since the pleading fails to plausibly plead an underlying constitutional violation, the supervisory and *Monell* claims against the County, O'Flynn and Harling also necessarily fail. *See, e.g., Dilworth v. Goldberg*, No. 10–CV–2224 (JMF), 2014 WL 3798631 at *11 (S.D.N.Y. Aug. 1, 2014) ("In the absence of an underlying constitutional violation, a plaintiff cannot state a claim for supervisory liability or a claim under *Monell*.") (citations omitted).   In any event, the allegations concerning a county policy are wholly conclusory, since the pleading offers no facts to support the existence of a policy to deny medical care to detainees.[60]   To the contrary, the pleading indicates that there were written policies in place that were intended to ensure that drug-addicted inmates received detoxification monitoring.[61]   Accordingly, the claims against the County, O'Flynn and Harling must be dismissed.

---

[58]Amended Complaint, Exhibit 1 at p. 7.

[59]Amended Complaint ¶ 44.

[60]In his memo of law in opposition to Defendants' motion, Plaintiff further maintains that the County "failed to have policies that address communications between jail and medical employees regarding the detoxification of detainees." Docket No. [#25] at pp. 5-6.  However, the Amended Complaint does not plausibly plead a constitutional violation arising from such a deficiency.

[61]Amended Complaint ¶ ¶ 21, 23.  To the extent that Plaintiff is asserting that Defendants adopted a sham detoxification policy and then instructed employees to ignore the policy, the pleading does not contain facts to make such a theory plausible.

CMC, Umar and Biuso

The Amended Complaint contends that CMC, Umar and Biuso had a policy to provide inadequate medical care to prisoners, in order to save money.[62]  In support of that claim, the pleading indicates that other persons have successfully sued CMC, and that the New York State Commission of Correction has criticized certain aspects of CMC's operations.[63]  More specifically, the pleading alleges that the Commission of Correction previously "found deficiencies in staffing and care of detainees" in facilities at which CMS was providing care, including the Monroe County Jail (inmate spent five days "seriously ill"), the Broome County Jail (inmate died from heroin withdrawal), the Tioga County Jail (inmate committed suicide) and the Ulster County Jail (inmate did not receive "timely mental health assessment").[64]  The pleading does not indicate the dates of these alleged prior instances of deficient medical care.  Again, however, the supervisory and *Monell* claims against these defendants necessarily fail, since the pleading fails to plausibly state an underlying constitutional violation.

However, even assuming *arguendo* that the pleading adequately stated an underlying violation by one of CMC's employees, either Augello or McQueeney, it still does not state a plausible claim for supervisory or *Monell*  liability.  The applicable legal principles are well settled:

Under the standards of *Monell v. Department of Social Services*, 436 U.S.

---

[62] Amended Complait ¶ ¶ 32, 45.  Even though CMC is a private entity, it may be sued under a municipal liability theory. *See, Powell v. Correctional Medical Care, Inc.*, No. 13 cv 6842, 2014 WL 4229980 at *6 (S.D.N.Y. Aug. 15, 2014) ("Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses.") (citation omitted).

[63] Amended Complaint ¶ ¶ 32-34.

[64] Amended Complaint ¶ 33.

658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality. Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee.

Thus, isolated [unconstitutional] acts . . . by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability.  On the other hand, such acts would justify liability of the municipality <u>if, for example, they were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses</u>.  A plaintiff alleging that she has been injured by the actions of a low-level municipal employee can establish municipal liability by showing that a policymaking official ordered or ratified the employee's actions—either expressly or tacitly. Thus, a plaintiff can prevail against a municipality by showing that the policymaking official was aware of the employee's unconstitutional actions and consciously chose to ignore them. A municipal policymaking official's "deliberate indifference" to the unconstitutional actions, or risk of unconstitutional actions, of municipal employees can in certain circumstances satisfy the test for a municipal custom, policy, or usage that is actionable under Section 1983.

To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights. Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.

*Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (emphasis added; citations, internal quotation marks and footnote omitted).

In this action, the pleading does not allege the existence of a formal policy, but contends that an informal policy or practice can be inferred from the fact that other inmates

have suffered harm due to particular instances of inadequate medical care.   More specifically, the pleading indicates that CMC has, for years, provided contract medical care at jails in counties "across New York," including Albany, Broome, Rensselaer, Schenectady,Tioga and Ulster.   According to the hearsay newspaper article attached to the Amended Complaint as Exhibit C, between 2009 and 2011 there were a total of nine inmate deaths at jails where CMC provided medical care.[65]   Using brief quotes taken out of context, the newspaper article suggests that CMC provided sub-standard care in all nine instances where inmates died. [66]   Of the nine deaths, five were suicides, three involved medical issues including cardiac arrythmia and diabetes/pneumonia, and one cause of death was "undetermined."[67]  Viera's death is included in the nine, and the cause of death is listed as myocarditis, suggesting that CMC failed to treat her for that condition, but as already discussed there is no indication in the pleading that any CMC staff member knew that Viera suffered from myocarditis.  Notably, although CMC reportedly provides medical services at thirteen jails across New York State, the nine deaths occurred at just six of those jails: Ulster County (2), Monroe County (2), Dutchess County (2), Schenectady County (1), Broome County (1) and Tioga County (1).

The Court finds that given the very large number of inmates that CMC employees must have treated over the years on a continuous basis, nine unrelated deaths, five of which were by suicide and one of which was due to an undetermined cause, over the course of several years does not plausibly suggest the existence of a  policy of providing

---

[65]Amended Complaint, Ex. C at p. 1.

[66]Amended Complaint, Ex. C at p. 3.

[67]*Id.*

sub-standard care in order to save money, such as is alleged here. *See, Tanzi v. Town of Marlborough*, 2014 WL 2815777 at *8 (N.D.N.Y. Jun. 23, 2014) (Holding that a small number of isolated incidents does not plausibly suggest a municipal custom or policy) (collecting cases); *McNulty v. Yaneka*, No. 11-CV-08320 (ER), 2013 WL 684448 at *9 (S.D.N.Y. Feb. 25, 2013) ("Plaintiff's speculative and conclusory allegations of an unlawful custom or practice are insufficient to support a claim of municipal liability against CMC. Plaintiff's theory that CMC has a policy of making medical decisions based on cost is based on mere conjecture.").

Apart from failing to plausibly allege the existence of such a policy, the pleading also fails to plausibly allege that any conduct by CMC in this action was motivated by a desire to cut costs.  In that regard, Plaintiff essentially alleges that since CMS is a for-profit corporation, it is plausible to think that it intentionally endangered inmates' health to cut costs in any instance in which an inmate received sub-standard care,[68] even though one could offer the same speculation about any for-profit medical provider.  Consequently, the Court finds that the claims against CMC, Umar and Biuso must be dismissed.

Leave to Re-Plead is Denied

Although Plaintiff has not requested the opportunity to file a second amended complaint, the Court believes that any further attempt to replead would be futile in any event, since the informational sources which Plaintiff relied upon in bringing this action do not provide a basis for a plausible deliberate indifference claim that would also comply with Rule 11. *See, Longman v. Wachovia Bank, N.A.*, 702 F.3d 148, 151 (2d Cir. 2012) (district court has discretion to deny leave to amend *sua sponte*).  Accordingly, leave to replead is

---

[68]See, Pl. Memo of Law [#25] at p. 16.

denied.

## CONCLUSION

Plaintiff's cross-motion [#26] is granted, but Defendants' application to dismiss [#16]

is also granted in its entirety, and this action is dismissed with prejudice.  The Clerk of the

Court is directed to close this action.

So Ordered.


Dated: Rochester, New York
       October 2, 2014          ENTER:


                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge